IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANA COPELAND

*Plaintiff,*

v.

NETFLIX, INC.; LIFETIME
ENTERTAINMENT SERVICES, LLC;
A&E TELEVISION NETWORKS, LLC.

*Defendants.*

No. 1:24-cv-00163-SB

---

Ronald George Poliquin, THE POLIQUIN FIRM LLC, Dover, Delaware.

*Counsel for Plaintiff.*

Daniel Marc Kirshenbaum, Robert M. Vrana, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Cydney S. Freeman, Jonathan Segal, DAVIS WRIGHT TREMAINE LLP, Los Angeles, California; Jesse Feitel, DAVIS WRIGHT TREMAINE LLP, New York, New York.

*Counsel for Defendants.*

---

**MEMORANDUM OPINION**

March 11, 2025

BIBAS, *Circuit Judge*, sitting by designation.

Fame has many costs. One comes from the First Amendment: It shields publishers from lawsuits when they report inaccurately about public figures involved in public controversies (as long as they do so without "actual malice"). This case begins and ends with that First Amendment shield.

While R. Kelly was being tried for sex crimes and child abuse, his personal assistant Diana Copeland went on national TV to discuss what she had seen. Then a documentary about Kelly discussed Copeland's supposed role in his crimes. Because of this negative coverage, Copeland sued the show's producers and distributors for defaming her, appropriating her name and likeness, and committing related torts. But she had thrust herself into this public controversy and became a public figure in it by appearing on national TV. So she must plausibly plead that defendants had so-called "actual malice"—that they knew (or recklessly disregarded) that the statements featured in the show were false. But she does not. So I now dismiss her defamation claim and other tort claims that recycle it. Plus, she has failed to plausibly plead that defendants used her name and likeness for its unique value (as opposed to its newsworthiness). So I also dismiss her claim of appropriation.

## I. A DOCUMENTARY ALLEGES THAT COPELAND HELPED A SINGER PREY ON GIRLS, SO SHE SUES

On this motion to dismiss, I must take the complaint's factual allegations as true, drawing all inferences for Copeland. Fed. R. Civ. P. 12(b)(6); *Pinkney v. Meadville*, 95 F.4th 743, 746–47 (3d Cir. 2024).

From 2006 to 2008, and again from 2017 to 2018, Diana Copeland worked as a "personal assistant[]/house manager[]" for world-famous singer R. Kelly. 2nd Am. Compl. ¶ 20, D.I. 23-1. In 2019, Kelly was arrested and charged "with using his fame and organization to lure young people into abusive sexual relationships." *United States v. Kelly*, 609 F. Supp. 3d 85, 105, 108 (E.D.N.Y. 2022). Copeland was "shocked" to learn about Kelly's crimes and testified for the prosecution at his trial. 2nd Am. Compl. ¶ 21.

Lifetime Entertainment Services made a multi-season documentary series about Kelly's crimes, called *Surviving R. Kelly*. *Id.* ¶¶ 2, 22. Lifetime repeatedly tried to involve Copeland in the series. Before it aired and before Kelly was criminally charged, the series's producers invited Copeland to appear in it, but she said no. *Id.* ¶ 22. Following the charges, Lifetime kept making episodes about Kelly. *See id.* In 2019 and 2021, the producers again invited Copeland to take part, but again she said no. *Id.*

A month after the last invitation, Copeland went on *Good Morning America* "for a brief interview regarding her experience with Mr. Kelly." *Id.* at ¶ 23. In that interview, Copeland admitted that she had made travel arrangements for Kelly's many girlfriends and often went along on their outings. D.I. 28-3, Freeman Decl. Ex. C at 2:12–2:18, 3:53–4:26 (available at https://perma.cc/ACG9-56TD). She revealed that his girlfriends would not speak to other men in public because "you can pretty much surmise that" Kelly had told them not to. *Id.* at 2:12–2:50. One time, a woman would not use the bathroom on a public outing because she "did not have permission from

3

Kelly." *Id.* at 2:53–3:12. But Copeland stressed that she had never made travel arrangements for any underage girls and had never seen Kelly lock up women, as the charges alleged. *Id.* at 4:03–4:55. When asked if any of this "raised an alarm" for her, she replied that Kelly's "personal life is [his] personal life, so my job stops at the threshold of his bedroom door." *Id.* at 3:30–3:53. She concluded: "Looking back, I think that I would have done things the same way I did. I don't think that anything that I did was wrong." *Id.* at 5:03–5:22.

More than a year later, Lifetime aired an episode of *Surviving R. Kelly* discussing Copeland's role. 2nd Am. Compl. ¶¶ 27–29. She alleges that the episode published multiple "explicit[ly] false statements" about her, including that:

- she had "acted as a liaison between Mr. Kelly and all of his girlfriends—including underage girls";
- "[e]very victim knew" her;
- she "took a victim to obtain an abortion and received another victim's STD results on Mr. Kelly's behalf";
- she "was directly involved in helping underage women cross state lines";
- she "was willing to do whatever it was that Mr. Kelly wanted because she was close to him and instrumental in his day-to-day life";
- she "made travel arrangements for Mr. Kelly's underage victims";
- she "knew about Mr. Kelly's criminal conduct and turned a blind eye"; and
- she "was part of Mr. Kelly's criminal enterprise."

2nd Am. Compl. ¶¶ 28, 44.

4

So Copeland sued Lifetime; its owner, A&E Entertainment Networks; and Netflix, which distributes the series. D.I. 1 ¶¶ 1, 3. She claimed defamation, false-light invasion of privacy, appropriation of her name and likeness, and intentional and negligent inflection of emotional distress. Compl., D.I. 1-1 at 11–15. Defendants removed this case from state to federal court, and I denied Copeland's motion to remand. D.I. 1, 8, 17.

Copeland claims that the episode defamed her by portraying her as Kelly's co-conspirator. 2nd Am. Compl. ¶¶ 6, 35. She says that this false narrative cast her in a "sinister and defamatory light," leaving people "believing she is immoral, a predator, dangerous, or untrustworthy." *Id.* ¶¶ 8, 36. The episode remains available to the public today on both Netflix and Lifetime. *Id.* ¶ 28.

Defendants now move to dismiss. D.I. 27. They attach to their motion a recording of Copeland's *Good Morning America* interview, which is discussed in the complaint. D.I. 28-3, Freeman Decl. Ex. C at 2:12–3:51. Even though that recording is not attached to the complaint, on a motion to dismiss I may consider sources outside the pleadings by taking judicial notice of them. *Est. of Roman v. City of Newark*, 914 F.3d 789, 796–97 (3d Cir. 2019). I may take judicial notice of what Copeland said in this interview. It is publicly available on *Good Morning America*'s website, and what she said "can be accurately and readily determined" from the recording, whose authenticity and accuracy "cannot reasonably be questioned." Fed. R. Evid. 201(b). For the same reason, I may take judicial notice of the court proceedings in Kelly's case. Defendants also ask me to take judicial notice of the contents of the *Surviving R. Kelly*

5

episode that is the subject of this dispute, transcripts from Copeland's testimony at Kelly's trial, and a letter from Copeland to the judge in that case. D.I. 26 at 2. Because I do not rely on these items in deciding this motion, I need not decide whether to take notice of those sources too.

## II. COPELAND DOES NOT PLAUSIBLY PLEAD DEFAMATION

### A. I need not decide the underlying state-law questions

Defendants argue that Copeland fails to plausibly plead defamation because (1) the fair-report privilege protects the statements, (2) the statements are non-actionable opinions based on disclosed fact, and (3) Copeland fails to plead, as she must, that defendants published the statements with "actual malice." D.I. 27 at 17–25. The first two issues are questions of state law. *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1085 (3d Cir. 1988) (fair-report privilege); *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1077 (3d Cir. 1985) (defamatory meaning). But I need not decide them. No matter how they shake out, Copeland's claim fails because she has not plausibly pleaded actual malice. So even if the statements were defamatory and unprivileged, the First Amendment bars her defamation claims. *Marcone*, 754 F.2d at 1077. I thus resolve this motion to dismiss on that federal question. *See Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) (taking a similar approach).

### B. As a limited-purpose public figure, Copeland must plausibly plead "actual malice" but has not

Not all false, defamatory statements are actionable. The First Amendment safeguards even defamatory speech if it was (1) made about a public figure and (2) not made with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).

6

Even the non-famous can be subject to this standard. A person who voluntarily "thrust[s] himself into the vortex" of an existing "public controversy" or "engage[s] the public's attention in an attempt to influence its outcome" becomes a limited-purpose public figure. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351–52 (1974). To tell whether someone fits that bill, our circuit uses a two-part test. Courts ask: "(1) whether the alleged defamation involves a public controversy" and, if so, (2) how involved the plaintiff is in that controversy. *McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985); *see also McCafferty v. Newsweek Media Grp.*, 955 F.3d 352, 359 (3d Cir. 2020). Under this test, Copeland is a limited-purpose public figure.

This case is about a public controversy—"a real dispute, the outcome of which affects the general public or some segment of it." *Marcone*, 754 F.2d at 1083 (internal quotation marks omitted). The challenged statements assert that Copeland not only turned a blind eye to Kelly's crimes, but also helped him by (among other things) coordinating with the girlfriends and helping young girls cross state lines. When Lifetime aired the challenged episode, Kelly had been charged with preying on girls for years, and ultimately he went to prison for doing that. *See United States v. Kelly*, 99 F.4th 1018, 1023 (7th Cir.); *Kelly*, 609 F. Supp. 3d at 110–22. The public would naturally be concerned with whether Copeland had helped him commit those crimes. *See McKee v. Cosby*, 874 F.3d 54, 62 (1st Cir. 2017) (finding a public controversy over accusations that Bill Cosby had sexually assaulted many women); *see also Marcone*, 754 F.2d at 1083 (holding that a significant crime is a public controversy).

7

Plus, by going on national TV to discuss Kelly, Copeland "voluntarily inject[ed]" herself into the public discourse. *Gertz*, 418 U.S. at 351. She "invited public attention, comment, and criticism" by admitting that she had accompanied Kelly's girlfriends on outings, made travel arrangements for them, known that they were afraid to speak to other men, and yet declared that "her job stops at the threshold of [Kelly's] bedroom door" and that she would not have done anything differently. *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 (3d Cir. 1980); D.I. 28-3, Freeman Decl. Ex. C at 3:30–3:53.

Because Copeland became a limited-purpose public figure, defendants are not liable for defamation unless they made false statements about her with "actual malice." *Sullivan*, 376 U.S. at 279–80. This is a term of art that does not require malice in the ordinary sense. Rather, "actual malice" requires a publisher to either know that the statements are false or "reckless[ly] disregard" whether they are true. *McCafferty*, 955 F.3d at 359 (internal quotation marks omitted). Reckless disregard means that the publisher "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Because actual malice focuses on the publisher's mental state, Copeland needs to plead it for each of the three defendants.

Copeland may do that using circumstantial evidence. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). But she still needs enough for this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). So she must plead "more than

8

labels and conclusions"; she needs "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). She has not borne that burden.

Though Copeland alleges that defendants were "reckless, … deliberate and malicious," that phrase just regurgitates the legal standard. 2nd Am. Compl. ¶ 5. It is conclusory, not a plausible fact. So are her allegations that "Defendants had access to the truth yet chose to ignore it" and that the "producers knew there was no evidence whatsoever to support the false narrative." *Id.* ¶¶ 6, 31; *see Pace v. Baker-White*, 850 F. App'x 827, 831 (3d Cir. 2021) (labeling similar statements as conclusory allegations of actual malice).

Even when Copeland offers more than legal conclusions, she does it to meet the wrong legal standard. She claims that defendants published these allegedly false statements to get back at her. 2nd Am. Compl. ¶¶ 7, 23. She alleges that the producers had it out for her because she chose to go on *Good Morning America* rather than appearing on their show and because the contents of the *Good Morning America* interview "undermined the Film's theme and message." *Id.* ¶¶ 7, 24, 31. In support of this claim, she pleads two pieces of circumstantial evidence. For one, she complains that the producers asked two former Kelly employees, who allegedly both had personal vendettas against Copeland, to appear on the show. *Id.* ¶ 25. For another, she also complains that a former employee who was interviewed on the show told her that the producers had encouraged the employee to say negative things about her. *Id.* ¶ 33.

9

At most, those two pieces of evidence suggest a bad motive. Yet motive does not matter. Actual malice has "nothing to do with bad motive or ill will." *Harte-Hanks*, 491 U.S. at 666 n.7. Even if defendants indeed had a "vendetta" against Copeland and wanted to "punish [her] for her public statements that contradict the Film's 'mob' theme," that would not state a plausible claim of actual malice. 2nd Am. Compl. ¶ 7. That is because "actual malice focuses on [Lifetime's] attitude towards the *truth*, not towards [her]." *McCafferty*, 955 F.3d at 360 (cleaned up).

Even if defendants did pursue this vendetta, there is no reason to infer that they seriously doubted that their statements were true. For instance, nothing in the complaint suggests that they had "obvious reasons to doubt the veracity of the [sources] or the accuracy of" their accounts. *St. Amant,* 390 U.S. at 732. Copeland does not even allege that defendants *knew* about the former employees' supposed vendettas or had any other reason to think that they "were prone to exaggeration or lying or would deliberately engage in such conduct." *Dodds v. ABC*, 145 F.3d 1053, 1063 (9th Cir. 1998). And she does not distinguish among defendants, failing to plead this mental state as to each one.

Copeland also says defendants falsely implied that she knowingly took part in a criminal enterprise. 2nd Am. Compl. ¶ 44. But she pleads nothing to suggest, as she must, that Lifetime intended to imply that or that it knew about that implication and recklessly disregarded its truth. *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 93 (3d Cir. 2013).

Finally, Copeland claims that Lifetime defamed her to "prioritize financial gain over the accuracy and integrity of [its] content." 2nd Am. Compl. ¶ 5. But Lifetime's alleged desire "to increase its profits" is also not enough to prove actual malice. *Harte-Hanks*, 491 U.S. at 667.

So Copeland's failure to plausibly plead actual malice dooms her defamation claim.

### III. COPELAND'S OTHER CLAIMS FAIL TOO

Copeland also brings three ancillary tort claims: (1) false-light invasion of privacy, (2) intentional and negligent infliction of emotional distress, and (3) appropriation of her name and likeness. These claims are also nonstarters.

### A. Lack of actual malice dooms the false-light and emotional-distress claims

Copeland's claims for (1) false-light invasion of privacy and (2) intentional and negligent infliction of emotional distress both fail for the same reason. Public figures cannot circumvent actual malice by dressing up their defamation claims as other torts. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (intentional infliction of emotional distress); *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) (false-light invasion of privacy). No matter what a plaintiff calls it, if a tort claim repackages a defamation claim, she must still show actual malice.

That requirement dooms these tort claims. Copeland alleges that defendants cast her in a false light and unreasonably intruded on her seclusion by falsely portraying her as Kelly's co-conspirator. 2nd Am. Compl. ¶¶ 48–52. But that claim stems from the same facts, the same conduct, and the same speech as her defamation claim. The

11

same is true of her emotional-distress claim. She alleges that defendants caused her emotional distress by casting her in a "defamatory light" because of an alleged vendetta. *Id.* ¶¶ 57–62. That amounts to the same allegation as her defamation claim. So these claims likewise fail for lack of actual malice.

### B. Copeland fails to plausibly plead appropriation

*1. Texas law applies to this claim.* Appropriation is a question of state law. The parties dispute which state's law applies to this suit. Copeland argues for Delaware or California law, as the series was produced in California and defendants are all incorporated in Delaware. D.I. 34 at 22. Defendants favor Texas law. D.I. 27 at 13–14. This is because, when Copeland first filed her suit in Delaware state court, she claimed: "At all material times, [she] is and was a citizen and resident of the State of Texas." Compl. D.I. 1-1, Ex. A ¶ 7. She also claimed that she "has not lived in any state for more than eight months for the past two years" because she is "nomadic." *Id.* ¶ 4. Once defendants removed this suit to federal court, Copeland cut out the allegation that she resided in Texas, alleging only that she is a nomad. 2nd Am. Compl. ¶ 10. If Texas law does not apply, defendants argue that New York law ought to apply because the trial and *Good Morning America* interview occurred in New York. D.I. 27 at 14.

I must resolve this conflict because it matters. For instance, Texas recognizes the common-law tort of appropriation. *Doggett v. Travis L. Firm, P.C.*, 555 S.W.3d 127, 130 (Tex. App. 2018). But New York does not; such claims are governed by statute and are rarely available. *See Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub'lg*, 727 N.E.2d 549, 551–52 (N.Y. 2000).

12

Federal courts sitting in diversity must apply the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). If the various states' laws conflict, Delaware courts follow the Second Restatement of Conflict of Laws and apply the law of the state that has the "mo[st] significant relationship" to the parties and issue. *Smith v. Del. State Univ.*, 47 A.3d 472, 480 (Del. 2012) (quoting Restatement (Second) of Conflict of Laws § 149 (Am. L. Inst. 1971)). Appropriation is an invasion-of-privacy tort. Restatement (Second) of Torts § 652A (Am. L. Inst. 1977). Where, as here, a publisher allegedly invades someone's privacy by disseminating a publication across many states, the state with the most significant relationship is typically the injured party's domicile. Restatement (Second) of Conflict of Laws § 153.

Texas has the most significant relationship to this case. Copeland claims that she has no permanent residence. But everyone has a domicile, even if she has no permanent home. *Id.* § 11 cmt. m. Under the Second Restatement, a domicile, "once established, continues until a new one is acquired." *Id.* § 19 cmt. a. Copeland's last domicile was Texas. Compl., D.I. 1-1, Ex. A ¶ 7. Indeed, she lived there when defendants allegedly appropriated her name and likeness. *Id.* (noting that she resided in Texas "[a]t all material times"). (I take judicial notice of that fact because it appears "in the record of th[is] case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks omitted); Compl., D.I. 1-1, Ex. A.) So Texas has the most significant relationship to the parties and issues. No relevant factor overcomes this strong presumption. *See* Restatement (Second) of Conflict of Laws § 153 cmt. b (referring to the § 6 factors). Texas law applies.

*2. Copeland has not plausibly pleaded appropriation.* Under Texas law, Copeland must plausibly plead that (1) defendants appropriated her name or likeness for its value rather than some other purpose, such as newsworthiness; (2) she can be identified from the publication; and (3) defendants gained some advantage or benefit by appropriating it. *Doggett*, 555 S.W.3d at 130 (citing *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994); *see also* Restatement (Second) of Torts § 652C cmt. d.; *Cain v. Hearst Corp.*, 878 S.W.2d 577, 578 (Tex. 1994) (adopting the Restatement's approach to privacy torts generally).

Copeland fails to plausibly plead appropriation. She alleges that defendants used her photo and name "for commercial purposes and with an intent to profit" from her identity as Kelly's former assistant. 2nd Am. Compl. ¶ 55. But that allegation just "formulaic[ally] recit[es] the [first] element[] of [this] cause of action." *Twombly*, 550 U.S. at 555. Copeland must allege enough facts to raise the reasonable inference that defendants used Copeland's name and photo for the unique "value associated with it," rather than the newsworthiness of Kelly's trial and Copeland's alleged connection to his crimes. *United Locating Servs., LLC v. Fobbs*, 619 S.W.3d 863, 871 (Tex. App. 2021). This is because the right created by this tort is "in the nature of a property right." Restatement (Second) of Torts § 652C cmt. a. People invade that right when they seek to obtain for themselves the benefit or value that the plaintiff could have obtained from her name or likeness. *See id.* cmt. c. This is why publishers, such as newspapers, are not liable for appropriation simply for using someone's name and likeness and being in a for-profit business. *Id.* cmt. d. So Copeland must allege facts

14

showing that her name and likeness were valuable and that defendants appropriated them for their value (rather than as incidental to a newsworthy topic). Her conclusory restatement of the legal standard is not enough. I thus dismiss her appropriation claim too.

\* \* \* \* \*

The First Amendment demands "adequate breathing space" for the free flow of ideas, especially about public figures on matters of public controversy. *Hustler Mag.,* 485 U.S. at 56 (internal quotation marks omitted). The actual-malice standard shields publishers from liability for mistakes, while still preserving defamation remedies where the publisher knew that he was publishing falsehoods or deliberately ignored the truth. Copeland fails to clear that high bar. The complaint offers only conclusions and speculation of ill will, not allegations of actual malice. That failure dooms Copeland's defamation, false-light, and emotional-distress claims. Plus, Copeland fails to plausibly plead that defendants appropriated her name and likeness for their intrinsic value. Perhaps Copeland can cure these defects. So I will dismiss her complaint without prejudice.