IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANA COPELAND,

       *Plaintiff,*

   v.

NETFLIX, INC.; LIFETIME             No. 1:24-cv-00163-SB
ENTERTAINMENT SERVICES, LLC;
A&E TELEVISION NETWORKS, LLC,

       *Defendants.*

---

Ronald George Poliquin, THE POLIQUIN FIRM LLC, Dover, Delaware.

*Counsel for Plaintiff.*

Daniel Marc Kirshenbaum, Robert M. Vrana, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Cydney S. Freeman, Jonathan Segal, DAVIS WRIGHT TREMAINE LLP, Los Angeles, California; Jesse Feitel, DAVIS WRIGHT TREMAINE LLP, New York, New York.

*Counsel for Defendants.*

---

## MEMORANDUM OPINION

December 19, 2025

BIBAS, *Circuit Judge*, sitting by designation.

Diana Copeland was an assistant to famous singer R. Kelly. When Kelly was arrested and charged with sex crimes, Copeland thrust herself into the limelight. She

went on national TV to discuss his alleged crimes and her experience working for Kelly. Now she sues the producers of a documentary for allegedly defaming her by accusing her of helping Kelly prey on girls. After she amended her initial complaint twice, I dismissed all her claims without prejudice. Now she tries again. But because Copeland did not plead actual malice and because Texas law bars her remaining claims, I dismiss the case once more—this time, with prejudice.

## I. A DOCUMENTARY ALLEGES THAT COPELAND HELPED KELLY PREY ON GIRLS, SO SHE SUES

On this motion to dismiss, I must take the complaint's factual allegations as true, drawing all inferences for Copeland. Fed. R. Civ. P. 12(b)(6); *Pinkney v. Meadville*, 95 F.4th 743, 746–47 (3d Cir. 2024).

From 2005 to 2008, and again from 2017 to 2018, Diana Copeland worked as a "personal assistant[]/house manager[]" for R. Kelly. Third Am. Compl. ¶ 21, D.I. 39. In 2019, Kelly was arrested and charged "with using his fame and organization to lure young people into abusive sexual relationships." *United States v. Kelly*, 609 F. Supp. 3d 85, 105, 108 (E.D.N.Y. 2022). Copeland was "shocked" to learn about Kelly's crimes and testified for the prosecution at his trial. Third Am. Compl. ¶ 22.

Lifetime Entertainment Services started making a multi-season documentary series about Kelly's crimes, called *Surviving R. Kelly*. *Id.* ¶¶ 2, 23. Lifetime repeatedly tried to involve Copeland in the series, but she said no. *Id.* ¶ 23. Following the charges, Lifetime kept making episodes about Kelly. *See id.* In 2019 and 2021, the producers again invited Copeland to take part, but again she said no. *Id.* ¶¶ 23, 27.

A month after the last invitation, Copeland went on *Good Morning America* "for a brief interview regarding her experience with Mr. Kelly." *Id.* ¶ 24. In that interview, Copeland admitted that she had made travel arrangements for Kelly's many girl-friends and often went along on their outings. D.I. 28-3, Freeman Decl. Ex. C at 2:12–2:18, 3:53–4:26 [https://perma.cc/ACG9-56TD]. She revealed that his girlfriends would not speak to other men in public because "you can pretty much surmise that" Kelly had told them not to. *Id.* at 2:12–2:50. One time, Copeland explained, a woman would not use the bathroom on a public outing because she "did not have permission from Kelly." *Id.* at 2:53–3:12. But Copeland stressed that she had never made travel arrangements for any underage girls and had never seen Kelly lock up women, as the charges alleged. *Id.* at 4:03–4:55. When asked if any of this "raised an alarm" for her, she replied that Kelly's "personal life is [his] personal life, so my job stops at the threshold of his bedroom door." *Id.* at 3:30–3:53. She concluded: "Looking back, I think that I would have done things the same way I did. I don't think that anything that I did was wrong." *Id.* at 5:03–5:22.

More than a year later, Lifetime aired an episode of *Surviving R. Kelly* discussing Copeland's role. Third Am. Compl. ¶ 32. Copeland alleged that the episode made mul-tiple "explicit[ly] false statements" about her and her involvement with Kelly's mis-deeds. *Id.* ¶ 84. So Copeland sued Lifetime; its owner, A&E Entertainment Networks; and Netflix, which distributes the series. Compl., D.I. 1 ¶¶ 1, 3. She claimed defama-tion, false-light invasion of privacy, appropriation of her name and likeness, and in-tentional and negligent infliction of emotional distress. *Id.* at 16–18.

Defendants moved to dismiss the suit. D.I. 26. I concluded that because Copeland is a limited-purpose public figure, she needed to plausibly plead actual malice but had failed to do so. D.I. 37 at 6–11. So I dismissed her defamation claim as well as her emotional-distress and false-light claims, which just recycled the defamation claim. *Id.* at 11–13. I also concluded that she had failed to plausibly plead appropriation. *Id.* at 14. But I gave Copeland a chance to amend these defects.

Copeland then timely filed her third amended complaint. D.I. 39. She now renews her defamation, false-light, and emotional-distress claims, but not her appropriation claim. *See* Third Am. Compl. ¶¶ 81–102. She adds new allegations too. Copeland asserts that defendants had access to court records and the transcript from Kelly's trial, yet published "defamatory statements which contradicted the court transcript." *Id.* ¶ 46. She also contends that defendants platformed a former Kelly employee whom defendants "knew had animosity against Copeland." *Id.* ¶ 29. She says this employee falsely stated that Kelly had "a lot of mental control over" Copeland and could get her "to do pretty much anything he wanted her to do," questioning whether she was "brainwashed." *Id.* ¶ 47. Plus, she says defendants broadcast someone who claimed that Copeland "handled everything pertaining to R. Kelly for 15 years," though defendants knew that she had worked for him for only seven years. *Id.* ¶¶ 54–57.

Defendants move again to dismiss. I previously took judicial notice of Copeland's *Good Morning America* interview. D.I. 37 at 5. Defendants now renew their request that I take judicial notice of two more sources: (1) the contents of transcripts from the testimony at Kelly's trial and (2) the contents of the *Surviving R. Kelly* episode at

issue. Because Copeland's amended complaint expressly relies on the contents of the trial transcript, I may take judicial notice of it. *See* D.I. 42 at 12–14; *Schmidt v. Skolas*, 770 F.3d 241, 249 (3rd Cir. 2014); *see also Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 664 (7th Cir. 2022) ("In a defamation case, where the published material is central to a plaintiff's allegations, courts routinely look outside the four corners of the complaint to view the entire publication."). But I consider the transcript only to take notice of the statements made in it, not for the truth of anything said at trial. *Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh*, 742 F. App'x 628, 632 (3d Cir. 2018). I do not rely on the contents of the episode.

## II. JURISDICTION

Before proceeding further, I must assure myself that this Court has subject-matter jurisdiction. In her third amended complaint, Copeland posits that this Court has jurisdiction "because the amount in controversy is within the Court's jurisdictional limits, and Defendants' wrongful conduct occurred in all fifty states, including this state." Third Am. Compl. ¶ 18. She adds that one of the defendants, "Netflix[,] is a citizen of this state." *Id.* Though Copeland never mentions 28 U.S.C. § 1332, her allegations about amount-in-controversy suggest that she means to invoke diversity jurisdiction. *See* 28 U.S.C. § 1332(a).

But there are two issues with this attempt. *First*, Copeland alleges that she is a "nomadic individual without citizenship established in any state." Third Am. Compl. ¶ 15. She adds that "[s]he does not maintain a permanent residence, and she has not lived in any state for more than eight months for the past two years." *Id.* ¶ 11. This assertion is dubious, as everyone has a domicile. *See Sivalls v. United States*, 205

F.2d 444, 446 (5th Cir. 1953) ("Every person has one, and only one, domicile."). Indeed, "it usually should be possible to assign state citizenship to any American citizen who is a party to a diversity suit." 13E *Wright & Miller's Federal Practice & Procedure* § 3612 (4th ed. 2008 & Supp. 2025). What is more, residence is just one among many factors we use to determine a person's domicile. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006) (listing a dozen other factors). Given all this, it is doubtful that Copeland is a citizen of no state.

*Second*, Copeland alleges that "A&E Television Networks, LLC is a limited liability company from Delaware," but says nothing about its members (or their citizenship). Third Am. Compl. ¶ 14. This is a problem because an LLC is a citizen of every state of which its members are citizens. So the allegation that A&E is a Delaware LLC is not enough. *See Pasternack v. Klein*, 751 F. App'x 332, 334 & n.3 (3d Cir. 2018) (requiring plaintiff to supplement complaint on appeal because she did not allege citizenship of LLC's members). Copeland needed to "conduct a reasonable inquiry" into A&E's members, "consult[ing] the sources at [her] disposal, including court filings and other public records." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 108 (3d Cir. 2015). After that, she could either have alleged the citizenship of A&E's members or, if she was unable to determine their citizenship after reasonable inquiry, "alleg[ed] that none of [A&E's] members are citizens of" the same state as her. *Id.* at 107. But Copeland did neither. Given these two problems, the Third Amended Complaint does not on its face adequately allege that the Court has subject-matter jurisdiction over this dispute.

Since then, Copeland's counsel has represented that Copeland would amend her complaint yet again to specify that she is a citizen of Texas. D.I. 55 at 1. And counsel clarified that Copeland would also amend to allege that "A&E Television Networks, LL[C] is [a] 50/50 joint venture owned by Hearst Communications and The Walt Disney Company." D.I. 57 at 1. Defendants admit that Disney has its principal place of business in California and Hearst has its principal place of business in New York. D.I. 59 at 1. Accordingly, I construe Copeland's letters as amendments to her complaint. *See Biggins v. Phelps*, 2019 WL 2025172, at *1 (D. Del. May 8, 2019); *see also* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."). Given these amendments, and because the remaining defendants are diverse from Copeland, this Court has diversity jurisdiction over this dispute.

### III. COPELAND AGAIN FAILS TO PLEAD ACTUAL MALICE

I covered the First Amendment's limitations on defamation in my opinion dismissing the second amended complaint. D.I. 37. The first question is whether the plaintiff is a public figure. *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1081 (3d Cir. 1985). I already found, and Copeland does not dispute (for purposes of this decision), that she is a limited-purpose public figure. D.I. 37 at 8; Answering Br. 10–11, n.2. That means the actual-malice standard applies. *Marcone*, 754 F.2d at 1087. So Copeland must show that the defendants either knew their statements were false or were "subjective[ly] aware[]" the statements were "probabl[y] fals[e]." *Id.* And because actual malice focuses on the publisher's mental state, Copeland needs to plead

it for each of the three defendants. D.I. 37 at 8. She failed to do that in her last complaint; so whether this complaint should be dismissed hinges on whether the new allegations accomplish what the last complaint did not. Copeland makes several moves to show actual malice this time, but none persuades.

### A. The transcript does not show that Lifetime had actual malice

Copeland's most significant change is including a litany of statements that Lifetime allegedly knew were false based on the transcript of Kelly's trial. Third Am. Compl. ¶¶ 45–80. This litany starts on shaky ground. In the Third Circuit, even a complete failure to review relevant documents does not establish actual malice. *See Lee v. TMZ Prods. Inc*, 710 F. App'x 551, 560 (3d Cir. 2017). Moreover, there is no requirement that a defendant's investigation be exhaustive, and "the existence of … scattered statements" contradicting the published narrative "cannot prove actual malice." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 86 (D.D.C. 2012); *see also Howard v. Antilla*, 294 F.3d 244, 255 (1st Cir. 2002) ("failure to connect the dots in a voluminous paper trail" may be evidence of negligence but not actual malice). The transcript stretches for thousands of pages across days of witness testimony. Even if the filmmakers were aware of it, Copeland must point to more than stray remarks to show actual malice. The statements she points to generally fall into three categories. None carries the day.

*First*, Copeland points to statements by other former Kelly employees and others suggesting that Copeland was under Kelly's "mental control," that she was "brainwashed," and that "she was willing to do whatever it was that [Kelly] wanted." *Id.*

¶¶ 47, 51, 70. Lifetime knew that was false, Copeland asserts, because a transcript from the Kelly trial "contradict[s]" this and "[n]o evidence exists of 'mental control' or 'brainwashing.'" *Id.* ¶¶ 46, 49.

I fail to see how these statements are "contradicted" by the transcript. That is in no small part because Copeland never shows her work: Her complaint and brief just assert generalities that the transcript "contradicted" these statements, never explaining what parts of the transcript she thinks help her or how the transcript conflicts with the statements in question. Third Am. Compl. ¶¶ 45–80; Opening Br. 8. So I am left with little more than *ipse dixit*. That will not do. Copeland must plead "more than labels and conclusions"; she needs "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Even though alleging that the transcript contradicts the statements in the documentary is better than merely alleging that they are false, it still falls below the threshold level of detail needed to survive a motion to dismiss.

And even when Copeland does point to specifics, she misses the mark. Copeland calls attention to an interviewee's suggestion that Copeland was "brainwashed." Third Am. Compl. ¶¶ 47, 49, 51. This statement is obviously hyperbole. "Brainwashing" refers to "[t]he systematic and often forcible elimination from a person's mind of all established ideas" and is "regarded as the kind of coercive conversion practiced by certain totalitarian states on political dissidents." "Brainwashing, n.," in Oxford English Dictionary, online ed., Oxford University Press, https://www.oed.com/diction-

ary/brainwashing_n (last visited Dec. 8, 2025) [https://perma.cc/WF2Y-G442]. In context, it is not plausible that the interviewee was suggesting that Kelly had forcibly eliminated all of Copeland's established ideas. "[A] reasonable television viewer" would understand she was suggesting—hyperbolically—that Copeland had been strongly influenced by Kelly. *Pierce v. Cap. Cities Commc'ns, Inc.*, 576 F.2d 495, 509 (3d Cir. 1978). "[H]yperbole," without more, is not evidence of actual malice. *Id.* at 508. And since the transcript does not show that the notion that Kelly controlled Copeland is not "substantially accurate," Copeland has not pleaded actual malice. *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 601 (D.C. Cir. 1988); *see also Greenbelt Co-op. Pub. Ass'n v. Bresl*er, 398 U.S. 6, 14 (1970) ("rhetorical hyperbole" not actionable).

Defendants point to parts of the trial transcript that they argue support Lifetime's statement that Copeland was under the "control" of Kelly. Opening Br. 18–19. This testimony is not strong evidence that Copeland was under Kelly's control; it shows only that Kelly employed Copeland and that Copeland worked closely with Kelly at different points, including in supervising Kelly's female guests. But Copeland still points to nothing in the transcript undermining the notion that Copeland's judgment was compromised by Kelly, his money, or his status as Copeland's employer. So this category of statements does not establish actual malice.

Besides, Copeland's reliance on the trial transcript has a more fundamental problem. Copeland mostly does not assert that the transcript flatly contradicts the challenged statements. Rather, Copeland claims that Lifetime knew (or was reckless in

not knowing) that the transcript *did not support* the allegedly defamatory state-
ments. *See* Third Am. Compl. ¶¶ 46, 49, 52–53.

"The absence of evidence, however, is not evidence of absence." *United States v.
Tucker*, 12 F.4th 804, 818 (D.C. Cir. 2021); *see also Chambers v. Sec'y Pa. Dep't of
Corr.,* 442 F. App'x 650, 656 (3d Cir. 2011) (same). Even if the transcript contains no
evidence of Kelly's control over Copeland, that does not affirmatively show that Kelly
did not have control over her. Because Copeland is a limited public figure, she must
do more than show that Lifetime knew the evidence produced against Kelly did not
support the statements —she must show Lifetime knew they were false (or was reck-
less in not knowing their falsity). *See Marcone*, 754 F.2d at 1087. Put another way,
for the absence of evidence in the transcript to help Copeland, it would have to be
true that if Kelly indeed had a high degree of control over Copeland, the transcript
would probably contain evidence of that control.

That is implausible. The trial was about *Kelly's* actions and whether *he* committed
the crimes of which he was accused; Copeland was just a witness. Why should I infer
that the trial would have detoured into Copeland's reasons for helping Kelly? She
does not say. Because Copeland pleads no facts suggesting that the transcript would
reflect Kelly's control over Copeland, the lack of support in the transcript is not evi-
dence that they are false, nor could the transcript have put Lifetime on notice of a
substantial risk that the statements were false.

*Second*, Copeland objects to statements about her tenure and job responsibilities
while working for Kelly. Third Am. Compl. ¶¶ 54–59. One documentary participant

said, "Diana Copeland handled everything pertaining to R. Kelly for 15 years. I don't know how she looks in the mirror." *Id.* ¶ 54. Another said that Copeland "operated as a liaison between Kelly and all of his girlfriends." *Id.* ¶ 60. Copeland alleges these statements are false because her own testimony and the trial transcript show that she handled only "household responsibilities" and "standard personal assistant duties" for only seven years, not fifteen. *Id.* ¶¶ 55, 57, 63.

Yet witnesses at trial claimed that Copeland acted as a liaison between Kelly and his female guests. Copeland helped schedule appointments for them. D.I. 28-1 at 88. She participated closely in at least some of Kelly's control over his female guests, such as standing outside the stall while some of them used the bathroom. *Id.* at 44. And she set up an abortion appointment for a woman who did not want to have an abortion and then drove the woman there. *Id.* at 19. The transcript suggests that Copeland did far more than just "handling household responsibilities." Third Am. Compl. ¶ 55. So Lifetime lacked malice as to those statements.

As for the length of Copeland's employment, only one quotation from the transcript shows that she did not work for Kelly for fifteen years. When asked how long she worked for him, Copeland responded "15 years on and off." D.I. 28-1 at 77. That three-word qualification is not enough to put Lifetime on notice that the statement it published—"Diana Copeland handled everything pertaining to R Kelly for 15 years"—was false. The qualification "on and off" merely suggests that there were "interruption[s] and resumption[s]" of her work. Off and On, *Oxford English Dictionary*, https://www.oed.com/dictionary/off-and-on_adv?tab=meaning_and_use#33831092

(last visited Dec. 8, 2025) [https://perma.cc/WF2Y-G442]. That could mean that Copeland took substantial time off (as she now contends) or that there were minor breaks in her employment by Kelly. The documentary makers could read that ambiguous qualification to mean the latter. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) (granting summary judgment for defendants because a rational resolution of an ambiguity is not a basis for actual malice).

The only part of the transcript that unequivocally draws the distinction upon which Copeland now relies is a letter that she wrote to the court stating that she had known Kelly for fifteen years, but had worked for him for only seven. D.I. 28-2 at 2. Copeland alleges that Lifetime was aware of and had access to that letter. Third Am. Compl. ¶¶45–46. Maybe so. But that is the only reference in thousands of pages of trial transcript. That single reference is not sufficient to put Lifetime on notice that it was false. *See Lee*, 210 F. App'x at 560 (negligent fact-checking is insufficient for actual malice). In any event, publication in the face of the subject's denial does not demonstrate actual malice. *Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 624 (2d Cir. 1988).

*Third*, Copeland disputes statements in the documentary that "every victim" and "every worker knew [her]." Third Am. Compl. ¶ 67. This was wrong, she claims, because "over sixty witnesses and twenty[-]five victims testified" at trial, but "only 3–4 referr[ed] to Plaintiff in any way." *Id.* ¶ 79. This argument has several problems.

Copeland's reliance on the number of total witnesses is misplaced. The documentary did not suggest that all the *trial witnesses* knew her but rather that Kelly's *employees* and *victims* did. How many of the witnesses knew her is beyond the point.

Copeland's reliance on the number of victims is better because it more closely maps onto the allegedly defamatory statement. But it runs up against the fundamental problem with her reliance on the transcript: Copeland alleges an absence of relevant testimony, not the presence of facts showing knowledge. So the failure of "[t]he vast majority of the witnesses" to mention her did not put Lifetime on notice that the statements that "every victim" and "every worker knew [her]" are false. *Id.* ¶¶ 67, 79.

Plus, hyperbole is not actionable. *See supra* 9–10. *Church of Scientology International v. Daniels* is a helpful example here. 992 F.2d 1329 (4th Cir. 1993). The Church of Scientology sued a drug company that suggested that Scientology is not a church but rather a commercial enterprise, and that "every judge and every investigative journalist" had reached the same conclusion. *Id.* at 1330. The Church of Scientology alleged this statement was defamatory. *Id.* at 1331. But the court observed that "literal inaccuracy in a colloquial or hyperbolic statement" is not actionable and found that this statement was not evidence of actual malice. *Id.* at 1335.

So too here. It is not enough for Copeland to allege that not literally "every victim" and "every employee" knew her. That is obvious exaggeration. The thrust of Lifetime's statement is that Copeland played a substantial role in Kelly's orbit and was known to many (or most) of his victims and employees. And Copeland admits that the

14

transcript shows that several of Kelly's victims testified that they knew Copeland. So Copeland's objection to the statement about the number of people who knew her fails.

Copeland's new allegations about what Lifetime knew and what the transcript says do not show that Lifetime knew, or was reckless in not knowing, that the statements it published were false. Copeland again fails to show actual malice.

### B. Copeland's three other theories do not save the day

Copeland makes three other arguments that Lifetime had actual malice. Those fail too. *First*, Copeland notes that interviewees disliked her. Third Am. Compl. ¶ 29. That alone does not show Lifetime had actual malice. The question is whether Lifetime knew, or was reckless in not knowing, that the *statements were false*, not whether the person making the statements had an axe to grind with Copeland. And interviewees' grudges do not indicate that they were lying—a source's bias is not an "obvious reason[] to doubt the veracity of the [sources] or the accuracy of" the accounts. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

*Second,* Copeland refers me to the Supreme Court's decision in *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989). She is right that under *Connaughton*, a publisher cannot purposefully avoid learning the truth. *Id.* at 692. But that does not help her. In *Connaughton*, the publisher's failure to investigate the statements it published was egregious. It chose not to interview the one witness most likely to confirm the published account. *Id.* at 683. The witnesses it did interview "consistently and categorically denied" the published account. *Id.* The publisher chose

"not to listen" to tape recordings of the conversations that underlay the story it published. *Id.* And the publisher had written another article on the subject—before performing any investigation—predicting a big scoop was coming. *Id.* at 684. This pre-investigation prediction "indicate[d] that [the publisher] had already decided to publish [the later, defamatory story], regardless of how the evidence developed." *Id.*

Lifetime's investigation was not so cursory. Here, unlike *Connaughton*, the transcript supports Lifetime's published version of events. That version of events is also supported by several witnesses, and Copeland alleges as much. Third Am. Compl. ¶¶ 47 (Suzette Mayweather), 54 (Faith Rogers), 60 (Noah Goldberg). While the publisher in *Connaughton* intentionally avoided the crucial tapes, Lifetime did a thorough enough investigation that included interviewing several witnesses whose stories corroborated the published statements and are not flatly contradicted by the transcript upon which Copeland relies. And nothing suggests that Lifetime refused to investigate anything as central and persuasive as "the one witness … most likely to confirm [the published] account of the events" in *Connaughton*. 491 U.S. at 682. Copeland even acknowledges that Lifetime tried to interview her, which further suggests that Lifetime lacked actual malice. *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018); Third Am. Compl. ¶ 27.

*Third,* Copeland suggests that Lifetime targeted her "because she refused to participate in their documentary." *Id.* ¶ 76. In dismissing the last complaint, I explained that a vendetta alone is no basis to infer knowledge that the statements were false. D.I. 37 at 10. Again, "the actual malice standard is not satisfied merely through a

16

showing of ill will or 'malice' in the ordinary sense of the term." *Connaughton*, 491 U.S. at 666. Copeland must show that Lifetime knew (or was reckless in not knowing) that the statements in question were false. *See id.* at 667. While a plaintiff may "prove the defendant's state of mind through circumstantial evidence," personal animus alone is not enough. *Id.* at 668.

### C. Copeland still nowhere pleads actual malice as to some statements

For several statements that Copeland regurgitates from her prior complaints, she does not allege that the transcript (or anything else) put Lifetime on notice of their falsity. *See* Third Am. Compl. ¶¶ 32, 84 (arranging travel for underage victims, taking a victim to an abortion, receiving a victim's STD results on Kelly's behalf, ignoring criminal conduct). Because she does not show what in the transcript (or elsewhere) should have put Lifetime on notice that these statements were false, Copeland still fails to show actual malice. *See Biro v. Conde Nast*, 807 F.3d 541, 547 (2d Cir. 2015) (actual malice must be plausibly alleged); D.I. 37 at 11 (dismissing Copeland's Second Amended Complaint for failure to plausibly plead actual malice).

### D. Copeland's amended allegations name only Lifetime, not the other defendants

Copeland's additions to the Third Amended Complaint also—confusingly—vacillate between referring to "Lifetime," "Defendant," and "Defendants," without explaining who did what. Third Am. Compl. 11 ("Defendant Lifetime Knew Were False"), ¶ 45 ("Defendants"), ¶ 46 ("Defendant"), ¶ 52 ("Defendants"), ¶ 58 ("Defendant"), ¶ 77 ("Defendants [sic] Lifetime"), ¶ 80 ("Defendant Lifetime"). The only named defendant

is Lifetime. So it is difficult to know whether Copeland means to refer to all defendants or only Lifetime. I doubt that these statements are specific enough to plead actual malice as to each defendant. But even if they are, Copeland fails to state a claim against the other defendants for the same reasons that she fails to state a claim against Lifetime.

## IV. COPELAND'S OTHER CLAIMS FAIL

In addition to defamation, Copeland pleads several other torts: false-light invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress. Those claims all fail because Copeland has not pleaded actual malice, as required by the First Amendment. D.I. 37 at 11. But they also fail under Texas law, which governs this case. *Id*. at 12.

Texas has not recognized false-light invasion of privacy for more than thirty years. *Cain v. Hearst Corp.*, 878 S.W.2d 577, 579 (Tex. 1994). Nor does Texas recognize negligent infliction of emotional distress. *See Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex. 1993). So those claims are out.

The intentional infliction of emotional distress claim fares no better. "Under Texas law, potentially defamatory statements"—even egregious ones, like implying someone committed a crime—"do not give rise to a cause of action for intentional infliction of emotional distress." *Tackett v. KRIV-TV (Channel 26)*, 1994 WL 591637, at *2 (S.D. Tex. May 5, 1994) (citing *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 451 (Tex. App. 1993)). That rule squarely forecloses Copeland's claim, which just repackages her defamation claim. Third Am. Compl. ¶¶ 97–102.

18

### V. BECAUSE AMENDMENT IS FUTILE, I DISMISS WITH PREJUDICE

Copeland is on her third amended complaint, yet still she has not plausibly alleged actual malice. Four tries is more than enough. *California Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 163 (3d Cir. 2004). And Copeland's false-light, invasion-of-privacy, and emotional-distress claims independently fail under Texas law, which no amendment can change. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Because amendment would be futile, I dismiss Copeland's Third Amended Complaint with prejudice.

\* \* \* \* \*

Actual malice is a high bar. Copeland claims that the transcript from Kelly's trial contains no evidence to support some claims made in the defendants' documentary. Even if that is so, the absence of evidence did not put defendants on notice that the claims were false. And many claims themselves were hyperbole or obvious exaggeration, as their context makes clear. So Copeland has not pleaded actual malice. Plus, Texas law bars Copeland's other claims. After four bites at the apple, I will not give Copeland a fifth. I dismiss her claims with prejudice.